COMPTROLLER OF THE STATE OF MARYLAND
*v.* JAMES JULIAN, INC. ET AL.

[No. 135, September Term, 1957.]

*Decided January 23, 1958.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Theodore C. Waters, Jr., Assistant Attorney General,* and *E. F. Engelbert, Staff Attorney for Retail Sales Tax Division,* with whom was *C. Ferdinand Sybert, Attorney General,* on the brief, for appellant.

*E. Dale Adkins, Jr.,* with whom were *John Van Brunt, Jr., Adkins, Potts & Laws* and *Killoran & Van Brunt* on the brief, for appellees.

HORNEY, J., delivered the opinion of the Court.

This is an appeal by the Comptroller of the Treasury, (the Comptroller), from an order of the Circuit Court for Wicomico County (Taylor, J.) abating a use tax assessment on certain construction machinery and equipment owned by James Julian, Inc., and James Julian, individually, (Julian).[1]

The original determination of tax liability by the Comptroller was appealed by Julian to the Circuit Court for Wicomico County, but before the court acted on the appeal, the record was remanded to the Comptroller for the purpose of taking further testimony, on the motion of Julian and over the objection of the Comptroller. At the second hearing before the Comptroller, Julian introduced additional testimony, but the Comptroller again made a determination of tax liability on January 31, 1957. Again Julian appealed to the circuit court, and Judge Taylor declared that the use tax assessment was erroneous and ordered the assessment abated.

In his brief, the Comptroller contended that the evidence

---

1. James Julian, a resident of Delaware, is the president and principal stockholder of James Julian, Inc., a Delaware corporation. The assessment was made against the corporation and the individual. As used herein the name "Julian" refers to both.

taken at the second hearing before him should not have been considered by the circuit court because that court was without power to remand the case for the taking of further testimony. However, the Comptroller abandoned that point in his argument in this Court and conceded, for the purpose of *this case only,* that the lower court had the power to remand. The Comptroller preferred not to concede the point for all purposes, and we permitted him to abandon it without prejudice. Julian did not object. Thus, the only question we must decide in this case is whether the evidence taken at both hearings before the Comptroller was sufficient to support the determination of tax liability and the resultant use tax assessment.

Julian, a contractor, is engaged primarily in the construction of state highways. He entered the State of Maryland for the first time in September of 1948 for the purpose of performing a contract with the State Roads Commission to build a road at Starr, near Centreville, in Queen Anne's County. When that project was completed in April of 1949, he removed his equipment from the State. There is no dispute regarding the exempt status of machinery and equipment acquired by Julian prior to its being brought into Maryland for use on the Starr job, it being conceded that Julian was, at that time, a non-resident using the property while temporarily in this State within the meaning of the exemption clause in the statute, [Code (1951), Art. 81, sec. 370 (e) (Exemptions)], and the regulation interpretative thereof, [Rule 76 of the Comptroller of the Treasury (Equipment of Non-Resident Contractors)].

Between April of 1949 and October of 1952, Julian neither resided in this State nor performed any work here, but during that period he submitted nine unsuccessful bids for other highway projects for the State Roads Commission. There were four bids in 1949, two in 1950, one in 1951 and two in 1952. The bonds furnished with each bid were conditioned on the execution of a contract for the performance of the work bid on if Julian was the successful bidder, not on the performance of the work thereunder if he were awarded the contract. There was also an unsuccessful bid for the con-

struction of a sewage system for the town of St. Michaels in Talbot County. Each year during the 1949-1952 period, Julian continued to qualify for road construction work by furnishing the information required for determining his capacity to submit bids.

Finally, in October of 1952, Julian was awarded a contract to construct the approaches to the Chesapeake Bay Bridge. From time to time thereafter as needed he moved the machinery and equipment he then owned into this State for the purpose of performing the bridge approaches contract. Since then he has been regularly engaged in construction work in Maryland. It is conceded that Julian has paid the use tax on all machinery and equipment purchased outside of and brought into Maryland subsequent to October of 1952.

The assessment in dispute—aggregating $13,995.02, including interest and penalties—involves only the machinery and equipment purchased prior to October of 1952 and brought into Maryland subsequent to that time. One of the exhibits —the one we are principally concerned with in this case— introduced at the second hearing before the Comptroller listed the machinery and equipment the Comptroller claims is subject to the use tax. The exhibit specifically identifies forty-seven items purchased between the years 1948 and 1952, both inclusive, at a total cost of $556,830.65, which had been depreciated to the extent of $241,004.66, leaving a value, after depreciation, of $315,825.99. At that time most of the machinery and equipment had an estimated remaining life of five years. In addition to the dates when most of the items listed were brought into this State—almost all of them in 1953 and 1954 [2]—the exhibit also showed the place to which the "equipment was originally delivered and intended for use", as well as "where [it] was used prior to entry into the State of Maryland". In every instance, with one exception, all items were delivered to places and used on jobs outside of this State, principally in Delaware, but also in Pennsyl-

2. Two items were brought into Maryland before October of 1952 —one in July of 1951 and the other in January of 1952. There is no explanation why or for what purpose they were then brought here.

vania, on several private projects, but mostly on state highway jobs.[3] The Comptroller conceded at the argument that the first item—a roller, which cost $1,815—should be excluded from the list. Previously, at the second hearing before the Comptroller, Julian had admitted that another item —a turnadozer, which cost $24,900, purchased in Pennsylvania on May 1, 1953, and subsequently delivered in Maryland for immediate use—was taxable.[4]

Julian also admitted that his gross dollar business in 1955 amounted to approximately two and one-half million on Delaware projects, and about one and one-half million in other states, including Maryland. Before depreciation, his inventory was $1,600,000. After depreciation, it was approximately $700,000. Since 1948 Julian has done approximately $4,542,000 worth of business in Maryland. More important it was Julian's policy to place orders for equipment only after he had obtained a job, at which time he would buy those items necessary to perform the contract. He never purchased equipment for "inventory" purposes unless it was needed for a job.

Specifically, the Comptroller contends that the assessment was lawful because the only inference which may be drawn from Julian's expanding business and continuous bidding on jobs in Maryland, aided by the applicable statutory presumptions, is that Julian purchased the machinery and equipment assessed to him with a *general intent* to use it in this State. On the other hand Julian contends that the assessment of the tax was properly abated because the Comptroller failed to show that Julian had a *specific intent* to use the property in Maryland, at or about the time of the purchase thereof, as was required to make the property assessed taxable under

---

3. All of the items delivered to the Elsmere (Delaware) yard were delivered there for servicing prior to use on the jobs indicated in the exhibit.

4. Since there is nothing to indicate that the tax on this item has not been paid it is assumed that it was included among the "machinery and equipment purchased outside of and brought into Maryland subsequent to October of 1952", on which the use tax has been paid.

the provisions of Code (1951), Art. 81, sec. 369, as it stood at the time of the assessment. Chapter 332 of the Acts of 1955 amended Section 369, *supra,* by eliminating the words "for use, storage or consumption within this State" appearing at the end of the first sentence in the first paragraph thereof. See Code (Cum. Supp. 1957), Art. 81, sec. 369. No question is before us in this case as to the effect of that amendment. Julian did not stress the point suggested in his brief to the effect that the use tax assessed in this case, based as it was on "original cost" instead of the "after depreciation value" of the property when it was brought into this State, might render the assessment confiscatory and therefore unconstitutional, but he did not concede that the tax assessed was lawful even if it were found that he is subject to the imposition of a use tax.

Judge Taylor, relying on our decision in *Comptroller of Treasury v. Thompson Trailer Corp.,* 209 Md. 490, 121 A. 2d 850 (1956), and his belief that the evidence failed to show an intention by Julian to use the assessed property in Maryland at or near the time of purchase, reached the conclusion that he should abate the assessment. We agree.

There is no doubt, under the statute before it was amended in 1955, that the imposition of the use tax requires a purchase of property outside of Maryland with an intent to use such property in Maryland. *Comptroller of Treasury v. Thompson Trailer Corp., supra; Comptroller of Treasury v. American Can Co.,* 208 Md. 203, 117 A. 2d 559 (1955). Since it is not disputed that Julian purchased the machinery and equipment, which has been assessed with the use tax, outside of this State, we are concerned here only with the question of intent to use such property in Maryland.

The Comptroller insists that his determination of tax liability and computation of the tax claimed to be due is *prima facie* correct under the provisions of Code (1951), Art. 81, sec. 341 (3), a sales tax provision, which, by the terms of Section 394 of the same Article of the Code, were made applicable to the use tax under some circumstances, and that, although it was incumbent upon Julian to produce evidence to show that the assessed property was not taxable, he failed.

to do so. The Comptroller, as he did in the *American Can* case, *supra,* and the *Thompson Trailer* case, *supra,* still relies on Code (1951), Art. 81, sec. 379, which provides in part:

> "* * * it shall be presumed that the tangible personal property sold by any person for delivery in this State, however made or carried, is sold for use, storage or consumption in this State. A like presumption shall apply to all tangible personal property delivered without this State and brought into this State by the purchaser thereof."

As we pointed out in the *Thompson Trailer* case, *supra,* at p. 498, that section "does no more than aid the Comptroller in enforcement by the presumption that property brought into the State is not within the exemption from tax given property bought for resale." The property assessed in the case now before us was definitely not for resale. The presumption created by Section 379, *supra,* is not applicable here. And the burden was not on Julian to produce evidence to show that the property was not taxable.

The real question then is clearly one of *intent* only. The Comptroller argues that proof of a *general intent* to use the property in Maryland is all that is required to make such property taxable. Julian says that there must be proof of a *specific intent* to use the property in Maryland before it becomes subject to the use tax here. Assuming, without deciding, that there was sufficient proof of a general intention—whatever that term may mean [5]—to use the property purchased where it is later taken to be used, it is clear that there was

---

[5]. The dissenting opinion in the *Morrison-Knudsen* case, *infra,* states that a contractor *who works regularly in many states* has a general intention to use property purchased where it is later taken to be used, but the opinion in 36 *Opinions of the Attorney General* 298, held that the use tax was applicable to equipment brought into this State by a nonresident contractor *who regularly constructed roads in Maryland over a period of several years.* Obviously, the situation of the contractor in Iowa with a "roving" disposition contrasts sharply with the status of the road builder in Maryland with a more "settled" nature.

not sufficient proof of an intention to use such property in Maryland at or reasonably near the time it was purchased as was required by Section 369, *supra*. We think that our decision in the *Thompson Trailer* case, *supra*, implicitly requires something more than a general intention to use the property purchased where it is later taken to be used. There we said at p. 495:

> "The Comptroller contends that all tangible personal property is subject to the use tax when brought into Maryland, no matter how long this may be after purchase, and without regard to whether the purpose was to use it here, unless it is brought in for the purpose of resale. We think the language of the statute clearly discloses that the Legislature did not go this far."

And, again, at p. 496, we said:

> "The words of the statute lead us to conclude that the Legislature intended the use tax to be collected only when personal property was purchased with the intention of using it in Maryland. The definition sections, [specifically 368 (d)], clearly and explicitly say that the purchase must be for use within the State and spell out that the use which is taxed is that within the State of property purchased by one who intended to use it in the State. The imposition of the tax is upon the purchaser—by definition, one who had the intent at the time of purchase to use the property purchased within the State. Further evidence of the legislative will is found in the fact that the measure of the tax is the purchase price. Obviously, this normally would be the current value of the property purchased. It must be inferred that the law-makers contemplated that the article bought would be taxed at, or reasonably near, the time of purchase, for if this were not so, the depreciation in value which time usually brings, would result in the tax being measured by a value bearing little relation to reality."

In *Morrison-Knudsen Co. v. State Tax Commission,* 242 Iowa 33, 44 N. W. 2d 449 (1950), the State Tax Commission argued that the equipment was purchased for use wherever the taxpayer's business required it. The Supreme Court of Iowa, by a five to four decision, said:

> "The argument is unsound * * *. Under defendant's [S.T.C.'s] reasoning a resident of another state which has no sales tax would be subject to the Iowa use tax if he moved here for a few months and brought with him his 8-year-old automobile or household furniture on the theory it was necessarily purchased for use wherever he might live. And such tax would equal two per cent of the original purchase price even if the property were worth only a small fraction thereof when brought to Iowa."

In *Rowan Drilling Co. v. Bureau of Revenue,* 60 N. M. 123, 288 P. 2d 671 (1955), the Supreme Court of New Mexico was confronted with two apparently conflicting cases: the *Morrison-Knudsen* case, *supra,* and the *Chicago Bridge & Iron* case, *infra.* The New Mexico court accepted the majority decision of the Iowa court. The California case was rejected for two reasons: (i) some of the equipment was purchased *specifically* to fulfill contracts for tanks constructed in California; and (ii) the New Mexico court, like the Iowa court, simply disagreed with the California court on the issue of whether specific intent to use in the taxing state was necessary for the tax to be validly imposed. The California court disregarded the fact that the materials may have been first used in another state. It should be pointed out that *Chicago Bridge & Iron Co. v. Johnson,* 19 Cal. 2d 162, 119 P. 2d 945 (1941), was decided approximately a decade before the Iowa and New Mexico cases, at a time when the use tax was a comparatively new type of taxation with which the courts had not had much experience. Moreover, the California court reasoned that, because some of the material purchased had been used to construct tanks for use in California, *all* of such materials were subject to taxation there.

Again, in *Atchison, Topeka & Santa Fe Ry. Co. v. State Board of Equalization,* 139 Cal. App. 2d 411, 294 P. 2d 181

(1956), relied on by the Comptroller, an intermediate appellate court in California held that certain engines ordered by a Kansas railroad company qualified to do business in California for use whenever and wherever they should be needed, including use in California or elsewhere, were subject to the California use tax when the engines were later used there. However, it should be emphasized that the use outside of California was only temporary, and it was intended that the engines should be ultimately used, and consumed, in California. Besides, there were three distinguishing features between that case and the case now before us: (i) the California court discussed only the constitutional issue, *i. e.*, whether the tax was a burden on interstate commerce; (ii) the use tax statute is given a broader interpretation there than it is here—see *Chicago Bridge & Iron* case, *supra;* and (iii) the railroad company was relatively certain that all of the engines would eventually be used in California—in the instant case there was a possibility that the bidder might never receive another Maryland contract. In fact all of the bids made were rejected during the same period when most of the machinery and equipment was purchased by Julian.

We see no reason to deny the application to the present case of the rule laid down in the *Thompson Trailer* case, *supra,* to the effect that the law of this State required the finding of an intention to use the property sought to be taxed in Maryland at or reasonably near the time it was purchased in order to subject such property to the use tax imposed by Section 369, *supra,* as it then stood. The Comptroller failed to prove such intention in this case. Instead we think that the exact opposite was manifest. It was shown, and not contradicted, that it was Julian's practice to purchase additional equipment only as and when it was required for a job he had been awarded, such as he did when he purchased the turnadozer which was delivered and used in this State, and on which he subsequently paid the use tax.

The order of the circuit court in its appellate capacity should be affirmed.

*Order affirmed, the appellant
to pay the costs.*